

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-16-00332-CR

_____

MICHAEL LOUISVILLE, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1416231D

Before Walker, Meier, and Gabriel, JJ.
Memorandum Opinion by Justice Meier

# MEMORANDUM OPINION

## I. Introduction

Appellant Michael Louisville appeals his conviction and forty-seven-year incarceration sentence for the continuous sexual assault of a child under fourteen years of age. In four points, Louisville argues that the trial court erred by allowing the State's designated outcry witness to testify, by denying his motion to suppress DNA evidence, by allowing the sexual assault examiner to testify to what the complainant told her during a medical exam, and by excusing a venire member prior to voir dire. Because we conclude that the trial court correctly let the outcry witness testify, that the trial court did not err by denying Louisville's suppression motion, that the trial court did not abuse its discretion by dismissing the complained-of venire member, and that the admission of the doctor's testimony was harmless, we will affirm.

## II. Background

In the spring of 2015, Jane[1] lived in an apartment in Euless, Texas, with Louisville, her stepmother (Stepmother), her two half-siblings, Stepmother's father (Grandfather), and, sometimes, Stepmother's cousin. Stepmother testified that although she is not Jane's biological mother, she had raised Jane since she was sixteen months old. Because the apartment they lived in had only two bedrooms, Jane slept

---

[1]Where possible, we use aliases to protect the identity of the minor complainant.

in the hallway in a sleeping bag. As a certified nursing assistant, Stepmother often worked the night shift while Louisville would watch the children.

According to Jane, about a week before her thirteenth birthday in March 2015, Louisville awoke her in the middle of the night and told her to come into his bedroom. Louisville then told Jane to undress. As she did, Louisville also removed his clothes. Jane said that Louisville then got up on the bed and placed a towel underneath him. As Jane stood between his legs at the edge of the bed, Louisville instructed Jane to "suck his private part." Shortly after, Louisville had Jane bend over the bed, and he then inserted his penis into her vagina. By Jane's account, Louisville eventually ejaculated into the towel he had placed on the bed. Louisville told Jane to go back to bed and not to tell anyone what had happened.

Jane averred that Louisville repeated this conduct "three to four times" a week through May 2015. Normally, these events would happen in the middle of the night while Stepmother was at work, they would occur in Louisville's bedroom, and each time Louisville would ejaculate into a towel. Jane also said that on "two or three" occasions, Louisville had put his mouth on her private part.

On May 29, 2015, the night after Jane's last day of elementary school, Jane averred that she felt "safe" that Louisville would not assault her that night because Stepmother was home. But in the middle of the night, Louisville awoke Jane from her sleeping bag in the hallway and told her to "suck" his penis. At that time, Louisville and Jane heard Grandfather getting out of bed. According to Jane,

Louisville got up immediately and acted as if he were going to the restroom. Believing that Grandfather had seen Louisville molesting her, Jane told Stepmother the next morning that Louisville had "been touching [her] in the wrong places."

Stepmother testified that she did not initially believe Jane because Jane had gotten in trouble and Louisville had "just whipped her the night before." She also averred that Jane had a penchant for lying. But Stepmother said that she began to believe Jane as she described the incidents. Jane told Stepmother how long these things had been going on and the frequency at which they occurred. According to Stepmother, upon reflection, she recalled that Jane's behavior had changed that spring. Specifically, Stepmother said that she noticed that Jane was always tired and would seek approval from Louisville about the clothes she would wear. Stepmother also noticed that Louisville would act jealous if he saw Jane walking with a boy. After consulting with Grandfather and her cousin, Stepmother told Jane to take a bath, and then she took Jane to Dallas Children's Hospital for a medical examination. A few weeks later, Stepmother said that she found several towels behind the couple's bedroom door. Stepmother described the towels as being in a state where they had been left wet but later dried. Stepmother washed the towels.

Dr. Kristen Reeder, an attending physician for Dallas Children's Medical Center's Referral and Evaluation of At Risk Children Clinic, testified that she examined Jane on May 30, 2015. Reeder said that she initiated her examination by asking Jane for details about what had happened in order to ensure a complete

4

medical examination; to decide whether a sexual assault kit needed to be performed; and to determine what, if any, medical treatment was needed. By Reeder's account, Jane told her that Louisville had "sexually assaulted" her. Specifically, she told Reeder that he had touched her private area with his private area, that he had put his finger inside her private area, and that he had made her put her mouth on his private area. Jane also told Reeder that these events had occurred multiple times per week since March 2015. After learning that the latest sexual contact had occurred the night before, Reeder conducted an acute examination and collected biological samples. Reeder averred that she did not expect to find semen due to Louisville's having typically ejaculated into a towel, but she did believe other DNA evidence might be found.

DNA analyst Rachel Burch conducted Y-chromosome STR testing on the vaginal swab Reeder took from Jane during the examination. Burch said that she was looking for male DNA and the potential presence of semen. By Burch's account, she obtained a partial Y profile with results at seven of seventeen locations, which she was able to match to a known sample of Louisville's DNA. Burch concluded that Louisville could not be excluded as a contributor to the male DNA profile obtained from the swab. She further explained that 98.8% of the African-American male population would be excluded from the profile—Louisville is African-American. But Burch averred that none of the vaginal swabs from Jane's exam revealed the presence of semen and that none of the several items she tested, including Jane's underwear,

revealed the presence of semen. She also stated that none of the oral swabs taken during Jane's exam revealed the presence of spermatozoa.

Prior to trial, Louisville moved to suppress the DNA evidence. Louisville argued that the warrant that Detective Robert Powell of the Euless Police Department had obtained in order to collect his DNA through buccal swabbing was not based on probable cause. He also argued that the manner in which Powell collected his DNA did not comport with the instructions of the warrant itself. Specifically regarding probable cause, Louisville argued that because the affidavit that Powell submitted in order to obtain the warrant did not affirmatively state that investigators had obtained DNA from Jane's sexual assault exam or from any items related to Jane's complaint at the time Powell sought the warrant, the warrant lacked probable cause to search his person for DNA. The trial court denied the motion.

Eventually, a jury found Louisville guilty of continuous sexual assault of a child under age fourteen. After hearing punishment-phase evidence, the jury assessed punishment at forty-seven years' incarceration. The trial court rendered judgment accordingly and this appeal followed.

## III. Discussion

### A.    The Reliability of Jane's Outcry

In his first point, Louisville argues that the trial court abused its discretion by allowing Stepmother to testify as the State's designated outcry witness. Specifically, Louisville argues that Jane's outcry to Stepmother lacked reliability because

6

Stepmother averred that Jane has a penchant for lying and Stepmother also testified that she did not initially believe Jane. The State responds that Jane's credibility is not the proper test for determining the reliability of her outcry, that her outcry meets sufficient indicia of reliability, and that thus the trial court did not abuse its discretion by allowing Stepmother to testify regarding the outcry. We agree with the State.

A trial court's decision to admit evidence will not be disturbed on appeal absent a clear abuse of discretion. *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990). A trial court has abused its discretion only if its decision falls outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). Article 38.072 of the code of criminal procedure provides a mechanism that requires the trial court to determine on a case-by-case basis if outcry testimony reaches the level of reliability required to be admissible as an exception to the hearsay rule. Tex. Code Crim. Proc. Ann. art. 38.072 (West Supp. 2014); *Norris v. State*, 788 S.W.2d 65, 71 (Tex. App.—Dallas 1990, pet. ref'd).

Indicia of reliability that the trial court may consider (under article 38.072) include (1) whether the child victim testifies at trial and admits making the out-of-court statement; (2) whether the child understands the need to tell the truth and has the ability to observe, recollect, and narrate; (3) whether other evidence corroborates the statement; (4) whether the child made the statement spontaneously in her own terminology or whether evidence exists of prior prompting or manipulation by adults; (5) whether the child's statement is clear and unambiguous and rises to the needed

level of certainty; (6) whether the statement is consistent with other evidence; (7) whether the statement describes an event that a child of the complainant's age could not be expected to fabricate; (8) whether the child behaves abnormally after the contact; (9) whether the child has a motive to fabricate the statement; (10) whether the child expects punishment because of reporting the conduct; and (11) whether the accused had the opportunity to commit the offense. *Norris*, 788 S.W.2d at 71; *see also Gonzales v. State*, 477 S.W.3d 475, 479 (Tex. App.—Fort Worth 2015, pet. ref'd).

Here, the evidence demonstrates that Jane made a spontaneous statement to Stepmother wherein she described a clear and unambiguous claim that Louisville had been sexually assaulting her. When Stepmother questioned Jane further, Jane described how Louisville had required her to "suck" his penis numerous times; that he had been putting his penis in her "private part"; and that he had been ejaculating into a towel—all statements made in Jane's own terminology. Jane also explained that she thought that Grandfather had seen Louisville committing these acts the night before. And although Grandfather denied that he had seen anything inappropriate, he did verify that Louisville was awake during the night at the time when Jane had said she believed Grandfather had seen them; thus, evidence exists that Louisville had the opportunity to commit these acts. At trial, Jane testified that she told Stepmother these things when she did because she believed that Grandfather had witnessed them and that she felt that she no longer had to fear that others would not believe her about what had been happening. Jane's testimony admitting that she had made the

8

statement to Stepmother is another indicium of the reliability of her statement. Further, Stepmother testified that during the time period when Jane said that these things were happening, Jane's behavior had changed in that Jane seemed more tired and that she seemed to seek Louisville's approval on what clothing she wore. Stepmother also averred that Louisville had become possessive toward Jane when he would see her walking with a boy.

Louisville argues that because Stepmother testified that Jane had a penchant for lying and because Grandfather reported to Stepmother that he had not seen anything inappropriate, Jane's statement is inherently unreliable. But in determining whether to properly admit an outcry statement, the trial court's focus is not on the credibility of the complainant but rather on the reliability of the outcry in terms of the time, content, and circumstances in which the outcry was made. *See Sanchez v. State*, 354 S.W.3d 476, 488–89 (Tex. Crim. App. 2011) ("[T]he narrow range of discretion that Article 38.072 allows a trial court means that the credibility of the outcry witness is not a relevant issue at a hearing to determine admissibility of an outcry."). Thus, it is simply not relevant whether Stepmother averred that Jane had a penchant for lying and that she did not initially believe Jane. And as explained above, even though Grandfather could not verify Jane's statement, he did verify that Louisville had the opportunity to commit these acts the night before Jane made her outcry. Thus, it was well within the zone of reasonable disagreement whether to admit the outcry, and the

9

trial court did not abuse its discretion by allowing Stepmother to testify regarding it. We overrule Louisville's first point.

## B. The Warrant for Louisville's DNA

In his second point, Louisville argues that the trial court erred by denying his motion to suppress the results of the comparison between his DNA taken pursuant to the warrant Powell procured and the DNA found during Reeder's examination of Jane. Specifically, Louisville contends that because investigators had not yet obtained any identifiable DNA from Jane's exam—or from any items associated with Jane's complaint—prior to seeking a search warrant to obtain his DNA, the warrant lacked probable cause to collect his DNA. Thus, according to Louisville, Powell's collection of his DNA violated his right against unreasonable searches under both federal and Texas law. Louisville also argues that the manner in which Powell collected his DNA violated his right against unreasonable searches.

### 1. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v.*

10

*State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

### 2. The Search of a Person's DNA

Compelling an accused to give a DNA sample is a search within the meaning of the Fourth Amendment. *Maryland v. King*, 569 U.S. 435, 446, 133 S. Ct. 1958, 1968–69 (2013) (holding that buccal swabbing an accused's inner cheek for collection of DNA is a search within the meaning of the Fourth Amendment); *Schlicher v. Peters*, 103 F.3d 940, 942–43 (10th Cir. 1996) (holding that taking a saliva sample for DNA information is a search within the meaning of the Fourth Amendment); *see also United States v. Kraklio*, 451 F.3d 922, 923 (8th Cir.), *cert. denied*, 549 U.S. 1004 (2006) (holding

that drawing blood for a DNA sample constitutes a search).  Using a swab to extract DNA from a defendant's cheek is invasive, an individual's DNA reveals private medical information, and the act of reaching into the subject's mouth to conduct the swab is an invasion into the body.  *United States v. Lassiter*, 607 F.Supp.2d 162, 165 (D.D.C. 2009); *but see King*, 569 U.S. at 461, 133 S. Ct. at 1977–78 (reasoning intrusion of buccal swabbing negligible in the context of routine booking because privacy expectations are lessened during booking).

Although few courts have considered the issue, some federal authority stands for the proposition that absent the existence of a known DNA sample associated with the alleged crime to compare the defendant's DNA to, a search warrant lacks probable cause to obtain a defendant's DNA.  *See Hindman v. United States*, Nos. 5:06-cr-00112-KOB-JEO, 5:10-cv-08023-KOB-JEO, 2015 WL 4390009, at *22 (N.D. Ala. July 15, 2015) (holding that in order to establish probable cause to obtain a DNA sample, "the government must possess a testable DNA sample sufficiently linked to the subject crime, which might then be compared to the suspect's sample to attempt to establish a 'match'"); *United States v. Robinson*, No. 11-CR-0325 (DWF/LIB), 2011 WL 7563020, at *5 (D. Minn. Dec. 2, 2011), *report and recommendation adopted*, No. 11-CR-325(1) (DFW/LIB), 2012 WL 948670 (D. Minn. Mar. 20, 2012) (recommending that probable cause had not been established to obtain the defendant's DNA because the government had not shown that DNA evidence on a firearm existed to compare against defendant's DNA); *United States v. Pakala*, 329 F.Supp.2d 178, 181 (D. Mass.

13

2004) (holding that a defendant cannot be subjected to a buccal swab until the government has determined whether a firearm contained a sufficient DNA profile in which to compare it to); *see also People v. Turnbull*, 61 V.I. 46, 54–55 (V.I. Super. Ct. 2014) (holding that absent a DNA sample to compare defendant's to, a search warrant for a DNA sample lacks probable cause); *but see United States v. Lopez-Castillo*, No. 15-cr-279(JNE/TNL), 2016 WL 1611582, at *2 (D. Minn. Apr. 22, 2106) (questioning proposition's correctness in light of *King*).  So, for purposes of this opinion, we will assume without deciding that the search warrant authorizing the taking of Louisville's DNA, and the manner in which it was taken, violated Louisville's rights against an unreasonable search.

We conclude, however, that the trial court did not abuse its discretion by denying the suppression of the DNA evidence in this case because the State had an independent source for obtaining Louisville's DNA aside from the search warrant that Louisville contests.

### 3.  Independent Source Doctrine

The independent source doctrine provides that facts do not become "'sacred and inaccessible' simply because they are first discovered unlawfully; rather, '[i]f knowledge of [facts] is gained from an independent source they may be proved like any others[.]'"  *Wehrenberg v. State*, 416 S.W.3d 458, 464 (Tex. Crim. App. 2013) (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 183 (1920)).  Thus, the independent source doctrine allows the admission of evidence

14

derived or obtained from a lawful source so long as that source is separated from any illegal conduct by law enforcement. *Wehrenberg*, 416 S.W.2d at 465 (citing *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 2508–09 (1984)). And the court of criminal appeals has held that application of the independent source doctrine is consistent with Texas's statutory exclusionary rule's requirement that evidence "obtained" in violation of the law is subject to suppression. *See* Tex. Code Crim. Proc. art. 38.23 (West 2017); *Wehrenberg*, 416 S.W.3d. at 467–68.

### 4. The Trial Court Did Not Abuse Its Discretion by Denying Louisville's Motion

In this case, when viewed in a light most favorable to the trial court's ruling, the record reveals that the State independently had access to Louisville's DNA apart from the DNA collected from Louisville pursuant to the search warrant that he now complains of. The record shows that the State charged Louisville, by indictment on June 2, 2015, with the offense of continuous sexual assault of a child under age fourteen. *See* Tex. Penal Code Ann. § 21.02 (West 2017). Because of the nature of the offense charged, and pursuant to the Texas Government Code, the district attorney filed a motion in the trial court requesting the collection of Louisville's DNA on August 17, 2015. *See* Tex. Gov't Code Ann. § 411.1471 (West 2017). The trial judge granted the State's request. On that request is the notation that Louisville's DNA was already "currently in CODIS," indicating that Louisville's DNA profile was already a part of the Combined DNA Index System (CODIS). *See King*, 569 U.S. at 444–45, 133 S. Ct. at 1968 (discussing authorization of CODIS by Congress, its

15

supervision by the Federal Bureau of Investigation, how CODIS includes DNA profiles from all fifty States and a number of federal agencies, and how these States and agencies have access to CODIS for the purposes of identifying certain classes of defendants). The State also filed a notice to introduce extraneous offense evidence demonstrating that Louisville has an extensive criminal record dating back to November of 1996 and spanning the States of Texas and Louisiana. A reasonable inference from this record is that Louisville's DNA was in CODIS prior to the warrant that he now complains of and that his DNA was in CODIS well before the lab report issued on January 15, 2016, linking his DNA to Jane. It is also noteworthy that the assistant district attorney and not Powell—the officer who procured the DNA warrant—signed the State's request for Louisville's DNA pursuant to the Texas Government Code. We conclude and hold that the trial court did not abuse its discretion by denying Louisville's suppression motion because the record supports that the State had access to Louisville's DNA through a source independent of the warrant he complains of. *See Stevens*, 235 S.W.3d at 740. We overrule Louisville's second point.

### C.    Statements Jane Made to Reeder

In his third point, Louisville argues that the trial court abused its discretion by allowing Reeder, the sexual assault examiner, to testify about what Jane told her during the examination. Specifically, Louisville argues that Reeder's testimony was impermissible hearsay; that the medical-diagnosis exception does not apply in this

16

case because "there is no evidence that [Jane] made her statements . . . for the purpose of medical diagnosis or treatment"; and that there is no evidence that Jane knew that she needed to be truthful about what she told Reeder. We agree with Louisville that there is no evidence in the record that Reeder impressed upon Jane that her statements were made for medical purposes or treatment and that proper diagnosis or treatment depended on the truthfulness of her statements, but we conclude that the trial court's admission of this testimony was harmless.

We review the trial court's decision to allow testimony over a hearsay objection for a clear abuse of discretion. *See Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). In this case, the trial court ruled that Jane's statements to Reeder—that Louisville had put his penis in her mouth and vagina, that Louisville had placed his mouth on her genital area and inserted his finger into her "private area," that Louisville had "sexually assaulted" her, and that these acts had transpired over a period of months—were admissible under the medical-diagnosis exception to the hearsay exclusionary rule. *See* Tex. R. Evid 803(4). Rule 803(4) provides that "statement[s] that" are "made for--and [are] reasonably pertinent to--medical diagnosis or treatment; and [] describe[] medical history; past or present symptoms or sensations; their inception; or their general cause" are admissible as an exception to the hearsay exclusionary rule. *Id.* For statements to be admissible under this hearsay exception, the proponent of the evidence must show that (1) the declarant was aware that the statements were made for the purposes of medical diagnosis or treatment and

17

that proper diagnosis or treatment depended on the veracity of the statements and (2) the particular statements offered were also "pertinent to . . . treatment"; that is, it was reasonable for the health care provider to rely on the particular information in treating the declarant. *Taylor v. State*, 268 S.W.3d 571, 589, 591 (Tex. Crim. App. 2008).

Reeder testified that she generally informed complainants why she was examining them and that she specialized "in doing these types of exams." Reeder also said that she had asked Jane about what was going on with her to ensure that she was doing everything appropriate with regard to her medical examination and to Jane's medical treatment, including any necessary laboratory work and medication. Reeder further averred that she asked Jane specific questions regarding what had transpired and when, in order to determine whether her examination should include procedures and treatments related to an acute injury. But at no time during voir dire prior to testifying before the jury or in front of the jury did Reeder state that she had made Jane aware that her statements were being made for the purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended on the veracity of her statements. *See id.*

This court recognizes that the Texas Court of Criminal Appeals has instructed that in the context of a "physician's cold examination table . . . it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate

18

information and that veracity will serve their best interest." *Id.* at 589. But in cases where courts have decided that a minor complainant had an "implicit awareness" of the need to be truthful, the testimony in those cases reached beyond what Reeder testified to, the complainants in those cases were sixteen years' old at the time they were examined, and there was no evidence of apparent immaturity. *See Duckworth v. State*, No. 04-12-00077-CR, 2013 WL 3871058, at *2–3 (Tex. App.—San Antonio July 24, 2013, no pet. (mem. op., not designated for publication) (holding that trial court did not abuse its discretion by admitting testimony of sexual assault examiner regarding what sixteen-year-old complainant told her during exam). Here, however, Jane was thirteen years' old at the time she was examined and Reeder did not testify that she fully explained the examination to Jane. Moreover, in this case, it is apparent from the record that the prosecutor did not understand that it was relevant whether Jane was aware that her statements to Reeder were made for the purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended on the veracity of her statements. Indeed, after Louisville objected, specifically citing *Taylor*, the prosecutor opined that such evidence was unnecessary for the admission of Reeder's testimony. *See id.* The prosecutor did state that she would ask questions of Reeder in front of the jury as to whether she had impressed upon Jane the need for her statements to be truthful, but the prosecutor never elicited that testimony. Furthermore, there is evidence in the record that Jane had a propensity to lie; thus, it

19

cannot be said that Jane possessed a "sufficient . . . apparent maturity" to be truthful during the exam. *Id.*

Though this case might be a close call, we conclude that this record is insufficient to support the trial court's ruling allowing Reeder to testify to the complained-of hearsay. Thus, the trial court abused its discretion by allowing Reeder to testify to the out-of-court statements.

Having determined that the trial court abused its discretion by admitting Reeder's testimony over Louisville's hearsay objection, we now apply a rule 44.2(b) harm analysis. Tex. R. App. P. 44.2(b); *see also West v. State*, 121 S.W.3d 95, 104 (Tex. App.—Fort Worth 2003, pet. ref'd). Under rule 44.2(b) we disregard the error if it did not affect Louisville's substantial rights. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (*citing Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78

S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

Here, the complained-of testimony was duplicative of both Jane's and Stepmother's testimony. Indeed, Jane, going into much greater detail than Reeder, averred to the jury that Louisville had engaged in the exact conduct that Reeder said Jane had stated to her. Stepmother, the designated outcry witness, also testified to the conduct that Jane had told Reeder. Furthermore, the State presented DNA evidence that Louisville was the assailant, and the State did not emphasize Reeder's testimony in its closing arguments. We hold that the complained-of testimony did not have a substantial or injurious effect or influence in determining the jury's verdict. *See King*, 953 S.W.2d at 271; *West*, 121 S.W.3d at 105 (holding that hearsay statements were harmless where complainant provided more "detailed, factually specific testimony" of sexual assault). We overrule Louisville's third point.

### D.    The Trial Court's Excusing Veniremember 38

In his fourth point, Louisville argues that the trial court improperly excused Veniremember 38 from jury duty. Specifically, Louisville argues that there is no evidence in the record that Veniremember 38 swore to her excuse for being dismissed. *See* Tex. Gov't Code § 62.110(a) (West 2017) ("[A] court may hear any reasonable sworn excuse of a prospective juror . . . and if the excuse is considered sufficient shall release him from jury service entirely or until another day of the term,

21

as appropriate."). We conclude that Louisville has failed to preserve this issue for our review.

Prior to the venire panel's being seated, the bailiff informed the trial court that although Veniremember 38 had checked in, she had not returned to the trial court when the panel was called into court. Shortly thereafter, and after a phone conversation between the trial court and Veniremember 38, the trial court informed both the State and defense counsel that he had spoken with Veniremember 38, that she had received a call from her mother informing her that her father had suffered a stroke, and that she had left the courthouse to drive to the hospital to be with her father. The trial court informed both parties that he was excusing Veniremember 38 from jury service based on his conversation with her. Defense counsel objected with the following statement: "The Court has not been able to verify that her father had a stroke. All we know is that she isn't here, and that is the reason she gave for not being here."

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). And the complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited.

22

*Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004); *Vafaiyan v. State*, 279 S.W.3d 374, 383 (Tex. App.—Fort Worth 2008, pet. ref'd).

Here, Louisville's complaint in his brief that Veniremember 38's excuse was not "sworn" to does not comport with his complaint in the trial court that the court had not verified that Veniremember 38's father had in fact suffered a stroke. Because Louisville's objection at trial does not comport with the complaint he now makes on appeal, he has forfeited this complaint for our review. *See Ott v. State*, 627 S.W.2d 218, 226 (Tex. App.—Fort Worth 1981, pet. ref'd) ("His objection is not the one made in his brief on appeal, that the jurors were excused for economic reasons. Any objection to the excusing of these jurors was therefore waived."). We overrule Louisville's fourth point.

## IV.  Conclusion

Having overruled all four of Louisville's points on appeal, we affirm the trial court's judgment.

/s/ Bill Meier
Bill Meier
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  November 1, 2018